# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

—————

Argued April 8, 2005           Decided May 31, 2005

No. 04-1070

PROGRAM SUPPLIERS,
APPELLANT

v.

LIBRARIAN OF CONGRESS,
APPELLEE

NATIONAL ASSOCIATION OF BROADCASTERS, ET AL.,
INTERVENORS

—————

Consolidated with
04-1071

—————

Appeals of an Order of the
Librarian of Congress

—————

*Gregory O. Olaniran* argued the cause for appellant Program Suppliers. With him on the briefs was *Michael E. Tucci*.

*Timothy C. Hester* argued the cause for appellant Public Broadcasting Service. With him on the briefs were *Ronald G. Dove, Jr.*, and *Paul Greco*.

*Mark S. Davies*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Peter D. Keisler*, Assistant Attorney General, and *William G. Kanter*, Deputy Director. *Anne M. Murphy*, Attorney, entered an appearance.

*Robert Alan Garrett* argued the cause for intervenors Joint Sports Claimants, et al. With him on the brief were *John I. Stewart, Jr.*, *Michael L. Lazarus, L. Kendall Satterfield*, and *Victor J. Cosentino*. *James L. Cooper* and *Philip R. Hochberg* entered appearances.

Before: SENTELLE, RANDOLPH, and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Two parties—Program Suppliers and Public Broadcasting Service—appeal the Librarian of Congress's order distributing 1998 and 1999 copyright royalty payments among classes of claimants in accordance with the recommendation of a Copyright Arbitration Royalty Panel. Because the Librarian's order survives our exceptionally deferential standard of review, we affirm.

## I.

Cable system operators (CSOs) make most of their money by convincing subscribers to buy their cable services, which typically consist of many channels. CSOs get their channels in two ways. First, they contract to carry cable networks, such as ESPN or CNN, that sell their programming only to CSOs. Second, they retransmit signals broadcast by over-the-air stations, such as independent television stations, public broadcasting stations, or affiliates of broadcast networks like ABC or CBS.

3

Under section 111 of the Copyright Revision Act of 1976, Pub. L. 94-553, 90 Stat. 2541, 2550, CSOs, assuming they fulfill certain requirements irrelevant to the issues before us, commit no copyright violations when they retransmit broadcast signals to their subscribers. 17 U.S.C. § 111. In return for these retransmission privileges, CSOs pay royalty fees into one or more of three related funds maintained by the Register of Copyrights. These funds compensate copyright owners for the distant retransmission of non-network programming, i.e., retransmission that reaches viewers beyond the range of the signal broadcast. *See Nat'l Ass'n of Broadcasters v. Copyright Royalty Tribunal*, 675 F.2d 367, 373 (D.C. Cir. 1982) (explaining that Congress focused on distant retransmission because "the local retransmission by cable television of a local broadcast merely duplicates programming that is already available in an area" and on non-network programming because network programming "theoretically is available across the country [and thus] is not adversely affected even though it is also available on cable"). The Librarian of Congress distributes each year's funds to copyright owners. *See* 17 U.S.C. § 111(d)(2)-(3) (2003); *but see* Copyright Royalty and Distribution Reform Act of 2004, Pub. L. No. 108-419, 118 Stat. 2341 (2004) (altering the statutory framework for future proceedings).

Ideally, copyright owners agree on the proportional distribution of funds. *See* 17 U.S.C. § 111(d)(4). If they fail to reach agreement, then the statute provides a process for sharing the pie—a process that typically takes place in two stages. In Phase I, royalties are distributed among classes of claimants: a percentage goes to Program Suppliers, the copyright owners of movies and syndicated shows; a percentage goes to the National Association of Broadcasters (NAB), which represents copyright owners of news programs; and so forth. In Phase II, royalties are distributed within each class: Program Suppliers' share, for example, gets split among Paramount Pictures, Twentieth

Century Fox Film Corporation, and other individual claimants.

For both phases, the adjudicative process is the same. In the version of the statute applicable to this case, the process begins with the Librarian appointing an ad hoc Copyright Arbitration Royalty Panel. 17 U.S.C. § 802(a)-(b) (2003). Consisting of three arbitrators, this "CARP" hears evidence and submits a report to the Librarian recommending a particular distribution. *Id.* § 802(c)-(f). The CARP "shall act on the basis" of the record and precedent, including prior decisions by the Librarian, other CARPs, and the Copyright Royalty Tribunal (a body that adjudicated royalty disputes under an earlier version of the statute). *Id.* § 802(c).

Once the CARP finishes its report, the Register advises the Librarian whether to adopt it, and the Librarian "shall adopt" the report unless he "finds that the determination is arbitrary or contrary to the applicable [statutory] provisions." *Id.* § 802(f). If the Librarian rejects the report, he examines the record and allocates the funds himself. *Id.* The Librarian's decision "may be appealed [to this court] by any aggrieved party who would be bound by the determination." *Id.* § 802(g). (Although the parties in this case style their papers as petitions for review, the statute's use of the word "appeal" controls, so we treat the "petitions" as appeals.)

This case involves the Phase I distribution of roughly $216 million in royalties for 1998 and 1999. For the first time since the 1990-92 royalty distribution, the copyright owners failed to agree on the Phase I distribution. The Librarian accordingly appointed a CARP to split the royalties among the following groups: Program Suppliers, Joint Sports Claimants (JSC), Public Television Claimants (PTV), NAB, Music Claimants, Canadian Claimants, Devotional Claimants, and NPR. The last two parties settled with the others, leaving the CARP with six claims to reconcile. The remaining parties submitted reams of evidence, including updated versions of two reports, the Nielsen

study and the Bortz survey, that the last Phase I CARP (the "1990-92 CARP") and that CARP's predecessor, the Copyright Royalty Tribunal, had used in making awards.

Presented to the CARP by Program Suppliers, the Nielsen study measures what cable subscribers watch. It does this by tracking a random set of cable-subscribing households and recording the viewing choices of individual household members. Aggregating this information, the study's authors estimate how total viewing distributes across different types of programming. The authors found that viewers watching cable retransmissions of distant signals in 1998 spent 59.1% of their time watching movies/syndicated shows (Program Suppliers' programming), 16.5% watching public television (PTV programming), 14.4% watching news (NAB programming), 9.4% watching sports (JSC programming), and .6% watching other programming. The 1999 Nielsen numbers showed a similar distribution.

The Bortz survey, supplied by JSC, measures what CSOs perceive as the relative market value of different types of programming. Researchers interview a sample of CSOs and ask how, if they had to negotiate for the right to retransmit broadcast signals distantly, they would allocate a fixed budget among different types of programming. As compared to the Nielsen study, Bortz gave a far higher value to sports and a far lower value to movies/syndicated shows and public television. Specifically, CSOs surveyed in 1998 said they would allocate 39.7% to movies and syndicated shows, 2.9% to public television, 14.8% to news programs, 37% to sports, and the rest to devotional and Canadian signals. The 1999 Bortz survey produced similar results.

Critical to one of the two issues we face here, Bortz's methodology had two anti-PTV biases. First, the researchers excluded from the otherwise random sample all CSOs that carry *only* public television stations, thus leaving out those CSOs that might be expected to assign the highest relative value to PTV.

Second, when interviewing CSOs that distantly retransmit only commercial signals, the researchers did not list public television as a type of programming. Accordingly, none of these CSOs assigned any value to public television, though they might have done so if asked. Although this second bias had occurred in earlier Bortz surveys, the first affected no Bortz survey prior to 1998.

In addition to the Nielsen and Bortz studies, the parties submitted other evidence, including evidence identifying relevant changes since 1992, the year of the last CARP award. For purposes of this appeal, three changes merit mention.

First, WTBS, a superstation as defined in 17 U.S.C. § 119(d)(9), which generated roughly 45% of all section 111 royalties in 1992, became a cable network in 1998. With the elimination of WTBS and another commercial superstation from the broadcast station pool, the relative Nielsen viewing shares for Program Suppliers (whose programming was featured heavily on WTBS) fell significantly, and the relative viewing shares for PTV rose to roughly four times their 1992 level.

Second, cable networks developed more shows that resembled PTV programming, especially PTV's signature children's programs. This competition from "look-alike" cable networks may have affected PTV's value compared to commercial broadcast stations, which faced less content competition from cable networks.

Third, in 1992 Congress passed the Cable Television Consumer Protection and Competition Act, Pub. L. 102-385, 106 Stat. 1460, which, among other things, required CSOs to carry a certain number of local broadcast signals from both public television and commercial stations. *See Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 630-32 (1994) (describing the Act's relevant provisions). These so-called "must-carry rules" caused CSOs to significantly increase

carriage of partially distant PTV signals (i.e., PTV signals that CSOs carry to both subscribers within the signals' original broadcast range and subscribers outside that range). At the same time, between 1992 and 1998, CSO carriage of distant PTV signals (i.e., PTV signals carried only to subscribers outside the signals' original range) declined.

With this and much more evidence in hand, the CARP recommended a distribution for the 1998 and 1999 royalties in the three funds at issue. For the largest of these funds—the only one we need discuss for purposes of this case—the CARP recommended the following distribution of 1998 royalties: 37.8% to Program Suppliers; 35.8% to JSC; 14% to NAB; 5.5% to PTV; 4% to Music Claimants; and 1.8% to Canadian Claimants. The CARP decided on a similar distribution for the 1999 royalties.

Following the earlier CARP's approach, the 1998-99 CARP based this distribution on how it thought the market would value the different programming types relative to each other in the absence of a compulsory licensing system. This CARP differed from the 1990-92 CARP, however, in its assessment of relative market value. The 1990-92 CARP recognized that the Bortz survey "focused more directly than any other evidence . . . [on] relative market value" but found certain aspects of the survey problematic. Most notably, the 1990-92 CARP believed that because Bortz only looked at *demand* for types of programming among CSOs, Bortz did not fully represent the relative market value of these types since that value would turn on both the supply of and the demand for programming. Based on this and other concerns, the 1990-92 CARP also relied on Nielsen. Departing from that approach, the 1998-99 CARP relied almost exclusively on Bortz, giving two reasons for its new approach. First, it revisited the 1990-92 CARP's concerns about Bortz and found them unwarranted, particularly given new evidence introduced by the parties. Addressing the 1990-92 CARP's

concern that Bortz measured only demand, for example, the CARP relied on evidence showing that "the supply of programming remains the same, irrespective of the price." Accordingly, to determine relative market value the CARP only needed to look at the demand side of the market represented by Bortz. Second, the CARP explained that its apparent departure from precedent continued an adjudicatory trend of relying less on Nielsen and more on Bortz. In allocating 1983 royalties, the Copyright Royalty Tribunal concluded that "the Nielsen Study has features to it that . . . have led us to give it far greater weight than any other piece of evidence." 51 Fed. Reg. 12,792, 12,808 (Apr. 15, 1986). By comparison, in distributing 1989 royalties, the Copyright Royalty Tribunal recognized that "both surveys [are] essentially valid and relevant," 57 Fed. Reg. 15,286, 15,299 (Apr. 27, 1992), and the 1990-92 CARP moved even further from Nielsen, finding that Bortz "is . . . focused more directly than any other evidence" on "relative market value." According to the 1998-99 CARP, its decision to ditch the Nielsen study represented a logical extension of this pattern of increased dependence on Bortz.

The CARP thus allocated awards based on Bortz except where it found specific problems with Bortz's methodology. Most notably, these problems occurred with regard to PTV's award, due to Bortz's two anti-PTV biases. Although the CARP found itself "unable to quantify the adjustments that are needed to remove the anti-PTV biases from Bortz," it was "comfortable establishing the PTV Bortz share . . . for both 1998 and 1999 as the 'floor'" for PTV's award.

Because the CARP had no satisfactory direct measure of PTV's 1998/1999 relative value, it determined PTV's award by assessing whether circumstances warranted a change in the 5.5% award PTV had received in 1992. Noting that "Nielsen studies can serve as a tool for assessing changed circumstances whenever the Bortz study can not be used," the CARP observed

that since 1992 PTV's relative Nielsen ratings had risen dramatically—in fact, almost quadrupled. The CARP stated that this change, which it thought stemmed from WTBS's conversion from a broadcast station to a cable network, "by itself, might militate in favor of raising PTV's award." Based on several other factors, however, the CARP found that this increase in viewing shares did not mean that PTV's relative market value had also increased. First, PTV's 1998-99 Bortz share had remained virtually identical to its 1992 Bortz share, suggesting a "rational inference" that CSOs "perceived no value enhancement in increased PTV viewing share." Second, PTV's increased competition from look-alike cable networks likely diminished the value of PTV signals relative to other broadcast stations, which faced less competition from cable networks. Third, the growth in PTV's relative Nielsen viewing shares must have resulted from increased carriage of partially distant PTV signals—an increase that in turn stemmed from the new must-carry rules. According to the CARP, this change demonstrated no increase in relative market value, particularly since carriage of distant PTV signals, more valuable to CSOs than partially distant signals, had decreased since 1992.

In sum, because the CARP found "no persuasive evidence that PTV's relative value has significantly either increased or decreased since 1990-92," it awarded PTV exactly the same percentage PTV received in 1992, i.e., 5.5%. This was the only percentage the CARP left constant. Compared to the 1991-92 distribution, it gave a much lower relative award for 1998 to Program Suppliers (37.8% as opposed to 55%) and higher relative awards to JSC (35.8% as opposed to 29.5%) and NAB (14% as opposed to 7.5%).

When the CARP's determination went to the Librarian, both Program Suppliers and Public Broadcasting Service (PBS)—which represents virtually all PTV claimants—challenged the proposed distribution. Program

Suppliers objected that the CARP had relied exclusively on Bortz and not at all on Nielsen. For its part, PBS argued that the CARP should have found that changed circumstances justified an increased PTV award. Finding neither argument convincing, the Librarian followed the Register's recommendation and adopted the CARP's proposed distribution. 69 Fed. Reg. 3606 (Jan. 26, 2004). Program Suppliers and PBS now appeal.

## II.

Under the Copyright Revision Act of 1976, Pub. L. 94-553, § 810, 90 Stat. at 2598, this court reviewed decisions of the Copyright Royalty Tribunal under standard Administrative Procedure Act principles. Intending this court to conduct an even more deferential review, Congress passed the Copyright Royalty Tribunal Reform Act of 1993, Pub. L. No. 103-198, 107 Stat. 2304, giving us "jurisdiction to modify or vacate a decision of the Librarian only if [we] find[], on the basis of the record before the Librarian, that the Librarian acted in an arbitrary manner." 17 U.S.C. § 802(g) (2003). As we explained in *National Association of Broadcasters v. Librarian of Congress*, 146 F.3d 907, 918 (D.C. Cir. 1998), this new standard of review "is significantly more circumscribed" than traditional APA review. "[W]e will set aside a royalty award," we held in that case, "only if we determine that the evidence before the Librarian compels a substantially different award." *Id.* Under this "exceptionally deferential" standard, we "will uphold a royalty award if the Librarian has offered a facially plausible explanation for it in terms of the record evidence." *Id.* When reviewing the Librarian's statutory interpretation, we employ the usual *Chevron* standard. *Recording Indus. Ass'n of Am. v. Librarian of Congress*, 176 F.3d 528, 531 (D.C. Cir. 1999).

### *Program Suppliers' Appeal*

Program Suppliers are unhappy because the Librarian, in

allocating most awards, accepted the CARP's decision to rely solely on the Bortz survey and not at all on the Nielsen study. According to Program Suppliers, this violated the statutory scheme, departed inexplicably from precedent, and at the very least occurred without sufficient notice. We find these arguments meritless.

Program Suppliers' statutory argument fails for a simple reason: the statute nowhere requires the CARP to rely on the Nielsen study or any other direct evidence of viewing. Indeed, Congress quite consciously provided "very little substantive guidance" to the Copyright Royalty Tribunal, *Christian Broadcasting Network, Inc. v. Copyright Royalty Tribunal*, 720 F.2d 1295, 1303 (D.C. Cir. 1983), and to the CARPs that succeeded it, *Nat'l Ass'n of Broadcasters*, 146 F.3d at 927. As the Report of the Committee on the Judiciary explained, Congress did "not include specific provisions to guide the Copyright Royalty [Tribunal] in determining the appropriate division among competing copyright owners of the royalty fees collected from cable systems." H.R. Rep. No. 94-1476, at 97 (1976); *see also Nat'l Ass'n of Broadcasters*, 146 F.3d at 927 (observing that "our past decisions make clear that the Congress delegated to the Tribunal (and now to the Librarian, the Register and the Panel) responsibility for developing the criteria by which claims are to be assessed"). Because Congress identified no criteria for allocating awards, we must give the Librarian's approach "controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 844 (1984); *see also Nat'l Ass'n of Broadcasters*, 146 F.3d at 924. We detect nothing either arbitrary or capricious about using relative market value as the key criterion for allocating awards. Indeed, it makes perfect sense to compensate copyright owners by awarding them what they would have gotten relative to other owners absent a compulsory licensing scheme. Nor did the CARP act unreasonably in declining to rely on Nielsen for direct evidence

of viewing, as Bortz adequately measured the key criterion of relative market value. Moreover, as the CARP put it, Bortz "subsumes *inter alia* all viewing data that a CSO might consider when assessing relative value of programming groups." In short, the Librarian's approach falls well within his broad authority.

Turning to Program Suppliers' second argument, we have no doubt that the CARP departed from precedent. Indeed, the Librarian never claims otherwise, and for good reason: the 1990-92 CARP relied on both Bortz and Nielsen, as had the Copyright Royalty Tribunal in earlier decisions. And as Program Suppliers point out, the Librarian mentioned in a 2001 order—albeit an order related to a Phase II proceeding where Bortz could not be used—"that actual measured viewing of a broadcast program is significant to determining the marketplace value of that program." 66 Fed. Reg. 66,433, 66,447 (Dec. 26, 2001). But as the Librarian explained in this case, and as counsel for Program Suppliers acknowledged at oral argument, the CARP "may deviate from what the [Copyright Royalty Tribunal] or prior CARPs have done provided that it provides a reasoned explanation." 69 Fed. Reg. at 3615. Here, as the Librarian recognized, the CARP not only "continued a trend from prior decisions that placed less and less reliance on the weight to be accorded the Nielsen study," but also gave a detailed, reasoned explanation for why it was doing so. *See id.* The CARP found that record evidence—such as testimony that the supply of programming types was unaffected by price—undercut the basis for the 1990-92 CARP's decision not to rely solely on the Bortz survey. Having given satisfactory reasons for rethinking the 1990-92 CARP's concerns about Bortz, the CARP was free to rely exclusively on that survey.

Finally, as to Program Suppliers' argument that the CARP unlawfully failed to give notice of its intent to abandon Nielsen, the Librarian points out that prior Phase I decisions by the 1990-

92 CARP and the Copyright Royalty Tribunal signaled dwindling reliance on Nielsen and increased reliance on Bortz. Even assuming lack of notice, however, we see nothing wrong with the CARP's action. While due process may require that parties receive notice and an opportunity to introduce relevant evidence when an agency changes its legal standard, *Hatch v. FERC*, 654 F.2d 825, 835 (D.C. Cir. 1981), the CARP made no such change. Like the 1990-92 CARP, it relied on relative market value. Its approach differed only in how it credited different types of evidence of relative market value. Program Suppliers cite no case, nor are we aware of one, holding that due process requires agencies to give advance notice of what evidence they intend to credit.

Program Suppliers' remaining arguments require little attention. They complain that the CARP lacked substantial evidence to reduce their award from the 1990-92 level. Even were we to apply a substantial-evidence standard of review, *but see Nat'l Ass'n of Broadcasters*, 146 F.3d at 918 (suggesting that the standard is even more deferential), the CARP had sufficient evidence to justify weighing Bortz and Nielsen differently than did the 1990-92 CARP. Program Suppliers' assertion that the CARP failed to reckon explicitly with a tangential piece of evidence likewise fails. Even making the doubtful assumption that the omission was error, it was harmless, as the evidence was "never tendered for anything more than corroborative evidence of evidence upon which the Librarian chose not to place great reliance," *Beethoven.com LLC v. Librarian of Congress*, 394 F.3d 939, 947 (D.C. Cir. 2005).

*PBS's Appeal*

PBS's challenge presents a closer question. According to PBS, the CARP erred in concluding that no changed circumstances since 1992 affected PTV's relative market value. PBS perceives two specific problems: that the CARP chose an

inappropriate methodology and that its application of this methodology was flawed.

Like the Librarian, we have no serious problem with the CARP's choice of methodology. Though the CARP could have explained its reasoning better, its basic approach makes sense. It began by recognizing that it had no direct measure of PTV's relative market value: the Bortz study contained anti-PTV biases whose effect it could not precisely calculate, and no other evidence reliably demonstrated PTV's value. The CARP thus decided to assess relative market value based upon whether circumstances had changed since 1992, when the prior CARP allocated 5.5% to PTV. To be sure, in considering this question, the CARP explicitly stated that it could look at shifts in Nielsen viewing shares, but it never suggested that it would rely exclusively on such shifts. This left the CARP free to examine other evidence, such as changes in the cable network market and in the regulatory situation. Moreover, and contrary to PBS's argument, we see no theoretical problem with the CARP's decision to compare PTV's 1992 and 1998/1999 Bortz numbers as part of its changed circumstances evaluation. Although flaws in the 1998/1999 Bortz surveys rendered them, standing alone, unusable for identifying PTV's precise relative market value, the CARP could still compare them with past Bortz surveys to evaluate whether overall circumstances had changed.

The CARP's application of its otherwise sound methodological approach is more troubling. Though recognizing the dramatic increase in PTV's Nielsen viewing shares—an increase that stemmed largely from superstation WTBS's disappearance from the pool of broadcast signals—the CARP nonetheless found no changed circumstances, in part because PTV's 1998/1999 Bortz numbers were the same as in 1992. As PBS points out, however, the CARP acknowledged that one of the two anti-PTV flaws in Bortz—the exclusion from the survey sample of CSOs carrying only public television

signals—was for all practical purposes new to the 1998/1999 Bortz surveys. Accordingly, if "true" Bortz valuation (i.e., Bortz valuation absent all biases) had remained the same in 1992 and 1998/1999, then due to the new bias, one would have expected Bortz numbers to decrease in 1998/1999. Put another way, unless some increase had occurred in the true Bortz valuation, the numbers should not have remained constant. Indeed, the CARP recognized as much, stating that "the lack of increase in PTV's Bortz share," as opposed to the increase in its Nielsen viewing share, "might be explained partially" by the new bias. Yet the CARP still used the parity of PTV's 1992 and 1998/1999 Bortz numbers to conclude that no changed circumstances had occurred.

Though viewed in isolation, the CARP's reliance on the parity of Bortz numbers seems problematic, the CARP relied on additional factors to conclude that circumstances had in fact not changed since 1992. Specifically, the CARP pointed to the rise of PTV's look-alike cable network competitors, the regulatory changes that led to an increase in CSOs' partially distant carriage of PTV signals, and the decrease in CSOs' distant-only carriage of PTV signals—all factors that convinced the CARP that the growth in PTV's Nielsen viewing shares stemmed from factors other than an increase in PTV's relative market value. Particularly given our exceptionally deferential standard of review, we think these factors provide a "facially plausible explanation," *Nat'l Ass'n of Broadcasters*, 146 F.3d at 918, for the CARP's conclusion of no changed circumstances. Put differently, because the evidence does not "compel[] a substantially different award," *id.*, we have no basis for setting aside the Librarian's decision to accept the CARP's recommendation.

The Librarian's decision is affirmed.

*So ordered.*