# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 14, 2014          Decided July 25, 2014

No. 13-1132

INDEPENDENT PRODUCERS GROUP,

APPELLANT

v.

LIBRARY OF CONGRESS AND REGISTER OF COPYRIGHTS,

APPELLEES

CHRISTIAN BROADCASTING NETWORK, INC., ET AL.,

INTERVENORS

Appeal of an Order of the Copyright Royalty Board

*Brian D. Boydston* argued the cause and filed the briefs for appellant.

*Sonia K. McNeil*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Stuart F. Delery*, Assistant Attorney General, and *Scott R. McIntosh* and *Mark R. Freeman*, Attorneys.

*Clifford M. Harrington*, *Matthew J. MacLean*, *Gregory O. Olaniran*, and *Lucy H. Plovnick* were on the brief for intervenors Settling Devotional Claimants and Program Suppliers, in support of appellees.

Before: ROGERS, BROWN and MILLETT, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: The Copyright Office of the Library of Congress manages a royalty fund that provides payments to copyright holders when they are statutorily obligated to license their work to third parties. Appellant Independent Producers Group (IPG) challenges the distribution of royalties from that fund for religious programming broadcasts on cable television in 1998. The complication for IPG is that, eleven years ago, its former president signed settlement agreements that fully disposed of IPG's interest in those 1998 royalties. On the basis of those agreements, the Librarian of Congress determined that there was no remaining controversy over the 1998 royalties and made a final distribution of those funds in 2003. A decade later, IPG asks this court to unravel that distribution. That we cannot do. Instead, because we lack statutory jurisdiction over this dispute, we dismiss this appeal.

3

**I**

The Constitution empowers Congress to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors * * * the exclusive Right to their * * * Writings[.]" U.S. CONST. Art. 1, § 8, cl. 8. Pursuant to that grant of authority, Congress adopted the Copyright Act to balance two often competing "communications policies grounded in the Constitution—ensuring the protection of intellectual property and encouraging the free flow of information" to the public. *National Cable Television Ass'n v. Copyright Royalty Tribunal*, 689 F.2d 1077, 1078–1079 (D.C. Cir. 1982) (footnote omitted).

One way the Copyright Act effectuates that balance is by providing for the compulsory licensing of copyrighted material in certain circumstances. *See* 17 U.S.C. §§ 107–122; *see also National Cable*, 689 F.2d at 1078. Such compulsory licensing limits the exclusive rights of copyright holders by allowing anyone who meets the statutory conditions—including the payment of a royalty fee—to make and distribute the copyrighted work without contractual permission from the copyright owner. *See Recording Industry Ass'n of America v. Copyright Royalty Tribunal*, 662 F.2d 1, 3 (D.C. Cir. 1981). The particular compulsory licensing provision at issue here enables cable operators, by paying a royalty fee, to retransmit to their customers television programs that are owned by broadcast stations. 17 U.S.C. § 111.

In 1998, the responsibility for setting reasonable rates and distributing them rested with *ad hoc* Copyright Arbitration Royalty Panels within the Library of Congress. 17 U.S.C. § 801 (2000) (amended 2004). In 2004, Congress reassigned those duties to a newly created Copyright Royalty Board

within the Library of Congress. Copyright Royalty and Distribution Reform Act of 2004, Pub. L. No. 108-419, 118 Stat. 2341 (codified at 17 U.S.C. §§ 801 *et seq.*). The Board is composed of three Copyright Royalty Judges. 17 U.S.C. § 801(b); 37 C.F.R. § 301.1. Those Royalty Judges are "appointed by the Librarian of Congress to encourage settlements and, when necessary, resolve statutory license disputes." 70 Fed. Reg. 30901-01.

To promote the efficient distribution of royalty fees, Congress crafted distribution procedures that encourage the private resolution of fee disputes and limit judicial review of such private agreements. For example, Congress excepted from the antitrust laws agreements by claimants (i) resolving "the proportionate division of statutory licensing fees among them[selves]," (ii) "lump[ing] their claims together and fil[ing] them jointly or as a single claim," or (iii) designat[ing] a common agent to receive payment on their behalf." 17 U.S.C. § 111(d)(4)(A).

At the outset of the fee distribution process, "every person claiming to be entitled to statutory license fees for secondary transmissions" must file a claim with the Copyright Royalty Judges." 17 U.S.C. § 111(d)(4)(A). The Royalty Judges subsequently "determine whether there exists a controversy concerning the distribution of royalty fees." *Id.* § 111(d)(4)(B). If the Royalty Judges conclude that there is no controversy, they authorize the Librarian of Congress to distribute the royalties to each qualified applicant. *Id.*

If, on the other hand, a controversy exists, the Royalty Judges must "conduct a proceeding to determine the distribution of royalty fees." 17 U.S.C. § 111(d)(4)(B). While that controversy is pending, the Royalty Judges retain "the discretion to authorize the Librarian of Congress to

proceed to distribute any amounts that are not in controversy" at any time. 17 U.S.C. § 111(d)(4)(C). For cable royalty distributions, the Royalty Judges typically conduct two rounds of proceedings. In Phase I, the Royalty Judges split the overall pot of money among the different categories of claimants, such as sports claimants and music claimants. *See* 37 C.F.R. § 351.1. In Phase II, the Royalty Judges divide the money between the individual copyright owners within each category. *Id.*

When a controversy arises, the Royalty Judges publish a notice of commencement of dispute proceedings in the Federal Register, 17 U.S.C. § 803(b)(1)(A)(i), at which point interested claimants must file petitions to participate, *id.* § 803(b)(1)(A)(ii). Once the time to file petitions expires, *id.*, the Royalty Judges send each petitioner a list of all the other petitioners, which marks the start of a three-month long "voluntary negotiation period." *Id.* § 803(b)(3).

For claims still in dispute after the negotiation period, the Royalty Judges accept written submissions, supervise a 60-day discovery period, and order a 21-day settlement conference period. 17 U.S.C. § 803(b)(6)(C). Only after those time-periods for voluntary resolution pass may the Royalty Judges resolve the dispute. *Id.* § 803(c)(1). Their decision must be in writing, "supported by the written record," and must "set forth the findings of fact relied on by the Copyright Royalty Judges." *Id.* § 803(c)(3). The Register of Copyrights then has 60 days to review that determination for "legal error" in the resolution "of a material question of substantive law[.]" *Id.* § 802(f)(1)(D). The final determination is published in the Federal Register. *Id.* § 803(c)(6).

Not every decision the Royalty Judges make is subject to judicial review. Instead, Congress provided that "[a]ny determination of the Copyright Royalty Judges *under subsection (c)*"—that is, 17 U.S.C. § 803(c)'s controversy-resolution process—"may, within 30 days after the publication of the determination in the Federal Register, be appealed, to the United States Court of Appeals for the District of Columbia Circuit[.]" 17 U.S.C. § 803(d)(1) (emphasis added).

**II**

This case arises from a tangled web of internal and external disputes involving IPG. IPG is a company that, as relevant here, represents copyright holders claiming an interest in the religious programming portion of the 1998 cable royalty fund. The company's founder, Raul Galaz, was convicted in 2002 of submitting fraudulent claims to the Copyright Office, in which he asserted rights to royalties (under the same statutory license scheme at issue in this case) for the cartoon show "Garfield and Friends." *See Galaz v. Jackson*, No. B184916, 2006 WL 648852, at *1-*2 (Cal. App. 2d Dist. March 16, 2006). Around the time of his conviction, Raul Galaz divorced his wife, Lisa Galaz. As part of the divorce decree, the former spouses split Mr. Galaz's 75% ownership interest in IPG's predecessor entities, each taking 37.5%. *See Galaz v. Oshita*, Nos. B181278 & B187428, 2006 WL 1461134, at *1 (Cal. App. 2d Dist. May 30, 2006). Marian Oshita, the president of IPG, owned the remaining 25%. *Id.*

In May 2002, Raul Galaz transferred his remaining stake in the companies to Oshita, leaving her with 62.5% ownership. *Galaz v. Oshita*, Nos. B181278, B187428, 2006 WL 1461134, at *1. But Lisa Galaz never signed off on that

transfer, and fought it in the courts. She won when a California court ordered that, "from the date of entry of this judgment [January 26, 2005], plaintiff, Lisa Katona Galaz, is the owner of a 75% economic and membership interest in" IPG. *Galaz v. Oshita*, No. BC 297015, Plaintiff's Judgment on Jury Verdict at 8 (Cal. Super. Ct. L.A. County, Jan. 26, 2005), J.A. 197.

The upshot of that internal imbroglio is that Marian Oshita controlled the company and acted as president between May 2002 and January 26, 2005. That period coincides with crucial negotiations over the Phase II distribution of the 1998 religious-programming cable royalties funds.[1] In July and November of 2003, Oshita signed two settlement agreements that together resolved IPG's claims to that portion of the 1998 fund. J.A. 134, 141.

With those agreements in place, all claimants in the religious programming category—including IPG—promptly moved the Register of Copyrights for a final distribution of royalties. *See* Notice of Settlement of Phase II Devotional Claims and Motion for Distribution of Funds, Copyright Office Docket No. 2001-8 CARP CD 98-99 (November 14, 2003), J.A. 94. The Register granted the motion, noting that "all Phase II controversies concerning the distribution of the 1998 cable royalty fees have been settled and no other

---

[1] The Copyright Office began Phase I proceedings for the 1998 royalty fund in 2000. *See* 65 Fed. Reg. 54,077-02 (Sept. 6, 2000). IPG participated. The Librarian announced a final Phase I allocation and published it in the Federal Register in 2004. *See* 69 Fed. Reg. 3606-04 (Jan. 26, 2004). This court upheld that allocation on appeal. *See Program Suppliers v. Librarian of Congress*, 409 F.3d 395 (D.C. Cir. 2005).

controversies exist regarding the distribution of royalty fees in this category." Order, Copyright Office Docket No. 2001-8 CARP CD 98-99 (November 19, 2003), J.A. 298. No party objected or sought judicial review of that decision or the subsequent distributions in 2003 and 2004.

IPG also asserted distinct royalty claims as a "program supplier." Program suppliers are "the copyright owners of movies and syndicated shows." *Program Suppliers*, 409 F.3d at 397. IPG pressed its claim in that category until March 2004, when Oshita entered into a settlement agreement with the Motion Picture Association of America that fully disposed of IPG's interest in that pot of money. J.A. 26. As part of that settlement, IPG "agree[d] to withdraw its notice(s) of intent to participate in the proceeding to distribute the 1997, 1998, and 1999 Cable Royalty Funds[.]" J.A. 37.

Relying in part on that agreement, the Copyright Office distributed almost all of the remaining 1998 cable royalties in May 2007, setting aside just $800,000 to resolve some remaining controversies in the program supplier category. *See* Order, Docket No. 2001-8 CARP CD 98-99 (May 24, 2007), J.A. 253.

Responsibility for the remainder of the 1998 fund, along with the 1999 fund, passed to the Royalty Judges in August 2007, *see* 72 Fed. Reg. at 45,071-01 (August 10, 2007), and the Judges announced in January 2008 the start of Phase II proceedings for those consolidated funds, *see* 73 Fed. Reg. 5596-01 (January 30, 2008).

IPG, having since come under the control of its current management, filed a petition to participate in the January 2008 dispute resolution proceeding, raising claims in both the religious programming and program supplier categories. The Motion Picture Association objected that the 2004 settlement

agreement barred IPG from taking part in the proceedings as a program supplier.  IPG responded by suing in California state court to have the 2004 agreement rescinded, arguing that Oshita had lacked the authority to bind the company.  With that state-court litigation pending, both IPG and the Motion Picture Association petitioned the Royalty Judges for a stay of proceedings, which was granted.  *See* Order Granting Motions to Stay, Docket No. 2008-1 CRB CD 98-99 (July 23, 2008), J.A. 299.

The California litigation concluded in July 2012, when the California Court of Appeal determined that, in 2005, IPG had ratified the program suppliers' settlement agreement by retaining the benefits of the settlement, and was therefore bound by it.  *See Worldwide Subsidy Group v. Motion Picture Association of America, Inc.*, No. B236717, 2012 WL 2950719, at *3 -*4 (July 20, 2012).  By resolving the case on that basis, the court did not decide whether Oshita had the authority, actual or apparent, to bind the company before 2005.

Following the California court's decision, the parties to the 1998 fund (other than IPG) moved for a final distribution, which did not include any payout to IPG.  *See* Motion for Final Distribution of the 1998 and 1999 Cable Royalty Funds and 1999 Satellite Royalty Funds, Docket No. 2008-1 CARP CD 98-99 (August 29, 2012), J.A. 1.  IPG strenuously objected.  *See* Opposition of Independent Producers Group to Motion for Final Distribution of 1998 and 1999 Cable Royalty Funds and 1999 Satellite Royalty Funds, Docket No. 2008-1 CRB CD 98-99 (September 5, 2012), J.A. 60.  In IPG's view, the 2004 program suppliers agreement covered only the program supplier category, and left the company's religious programming claims intact.  With respect to the separate July and November 2003 settlement agreements that

addressed IPG's share of the religious programming royalties, IPG's current management contended that it had "absolutely no details" regarding those agreements, not "even the date of [their] existence." *Id.* at 5, J.A. 64.

The Royalty Judges approved final distribution of the 1998 fund in January 2013. *See* Order Granting in Part Motion for Final Distribution of the 1998 and 1999 Cable Royalty Funds and the 1999 Satellite Royalty Funds, Docket No. 2008-1 CRB CD 98-99 (January 31, 2013), J.A. 78. The Royalty Judges found that "IPG's assertion that a controversy remains for the 1998 cable funds with respect to the devotional programming category is belied by the fact that the Librarian ha[d] already made a final distribution of those monies" back in November 2003. *Id.* at 2, J.A. 79. There being "no suggestion or proof" that the "settlement agreement between Devotional Claimants and IPG, which served as the basis for making the distribution, is defective or otherwise invalid," the Royalty Judges concluded that no controversy remained involving the 1998 fund. *Id.* at 3, J.A. 80.

IPG moved for reconsideration with respect to the devotional programming distribution only, arguing that Oshita lacked the power to bind the company in 2003, and that "IPG expressly notified several parties participating in cable royalty proceedings" of its internal disputes. *See* Independent Producers Group's Motion for Reconsideration of Order Granting Final Distribution of the 1998 Cable Royalty Funds (Devotional), Docket No. 2008-1 CRB CD 98-99 (February 15, 2013) at 5, J.A. 86.

The Royalty Judges denied reconsideration. *See* Order Denying Independent Producers Group's Motion for Reconsideration, Docket No. 2008-1 CRB CD 98-99 (March 11, 2013), J.A. 231. They reasoned that, even if IPG could

show that the 2003 agreements were invalid, "the Librarian of Congress * * * determined in 2003 that no controversies existed in the devotional programming category for the 1998 cable royalties * * *. Accordingly, he made a final distribution of those monies," which "ended the matter." *Id.* at 2, J.A. 232.

IPG appealed both determinations to this court, invoking the judicial review provision of 17 U.S.C. § 803(d). We decide the question of this court's jurisdiction *de novo. See, e.g., Battle v. F.A.A.* 393 F.3d 1330, 1332 (D.C. Cir. 2005).

## III

Unfortunately for IPG, this knotty dispute is not one that this court may untangle through an appeal under 17 U.S.C. § 803(d). Congress was explicit that this court has statutory jurisdiction only to review a "determination" by the Royalty Judges "under subsection (c)" of Chapter 8 of the Copyright Act. *See* 17 U.S.C. § 803(d)(1). And the straightforward text of that provision excludes IPG's effort to revisit a past distribution that was based on a "no controversy" determination.

To begin with, Section 803(d) does not authorize judicial review of just any objection to any decision made by the Royalty Judges. Instead, appeals may be taken only by an "aggrieved participant in the proceeding under subsection (b)(2) who fully participated in the proceeding and who would be bound by the determination." 17 U.S.C. § 803(d)(1).[2] Thus, one precondition for judicial review is

---

[2] The judicial review provision states, in full:

that there be a "proceeding" conducted by the Royalty Judges "under subsection (b)(2)." *Id.* And subsection (b)(2), in turn, governs petitions by parties to participate following the Royalty Judges' formal notice in the Federal Register that a contested proceeding will be conducted, *id.* § 803(b)(1) & (2). The 2003 determination that no controversy remained involving the devotional programming category, and the Royalty Judges' reliance on that decision here, did not involve any controversy "proceeding" "under subsection (b)(2)."

Moreover, a right to appeal does not arise unless the Royalty Judges conduct the type of controversy proceeding in which parties may "fully participate[]" and which results in binding determinations. 17 U.S.C. § 803(d)(1). Resolution of a disputed controversy through formal proceedings fits that bill; the decision in this case that no controversy exists and thus that no proceedings are needed does not.

---

> Any determination of the Copyright Royalty Judges under subsection (c) may, within 30 days after the publication of the determination in the Federal Register, be appealed, to the United States Court of Appeals for the District of Columbia Circuit, by any aggrieved participant in the proceeding under subsection (b)(2) who fully participated in the proceeding and who would be bound by the determination. Any participant that did not participate in a rehearing may not raise any issue that was the subject of that rehearing at any stage of judicial review of the hearing determination. If no appeal is brought within that 30-day period, the determination of the Copyright Royalty Judges shall be final, and the royalty fee or determination with respect to the distribution of fees, as the case may be, shall take effect as set forth in paragraph (2).

17 U.S.C. § 803(d)(1).

Likewise, Congress set a time limit on appeals, requiring that they be filed "within 30 days after the publication of the [Royalty Judges'] determination in the Federal Register." 17 U.S.C. § 803(d)(1). That timeframe works when a contested determination results in a final written decision by the Royalty Judges, which, by statute, must be published in the Federal Register. 17 U.S.C. § 803(c)(6). But a determination of no controversy and a distribution pursuant to private settlement, as occurred here, make no appearance in the Federal Register. The time to appeal from the type of non-controversy determination at issue here, if an appeal were permitted, would never begin or end.

The text of subsection 803(c), which identifies the proceedings from which appeals may be taken, drives the point home. That subsection lays out a variety of procedural requirements, all of which pertain to formally contested proceedings, and virtually none of which could apply sensibly to a finding of no controversy or payment pursuant to a privately negotiated settlement agreement.

First, subsection (c) requires that the Royalty Judges set forth the findings of fact on which they rely in making a determination, and that the determination be supported by the written record. 17 U.S.C. § 803(c)(3). That makes sense as a way to explain and justify a controverted determination after formal proceedings, as well as to ensure an adequate record for review in this court. But it ill suits the Royalty Judges' merely mechanical act of tracking a settlement agreement when making uncontested disbursements, a step for which no proceedings are undertaken and no facts formally found.

Second, the statute requires that a subsection (c) determination issue within eleven months of the conclusion of a three-week settlement period, which itself follows a sixty-

day discovery period. 17 U.S.C. § 803(c)(1) (cross-referencing Section 803(b)(6)(C)(x)). Discovery, however, is not needed for a voluntary settlement agreement. And if the parties reach an accord early in the settlement period, there would be no rational justification for Congress to insist that the Royalty Judges make them sit on their hands for another three weeks before releasing the funds. The existence of those time periods in subsection 803(c) thus highlights that putting a private settlement into effect is an entirely different process from imposing the Royalty Judges' independent "determination" on parties who could not agree on distribution.

Third, and relatedly, the eleven months the Copyright Act gives the Royalty Judges to reach a determination allows them to weigh evidence, determine facts, and prepare a written decision when the parties disagree. But giving effect to a voluntary settlement agreement takes far less time. In this case, it took just five days. Tellingly, Congress separately addressed the timing of distributions following settlement agreements, which can take place at any time "during the pendency of any proceeding[.]" 17 U.S.C. § 111(d)(4)(C). The statutory structure thus indicates that Congress put contested and non-contested distributions on distinct procedural tracks, permitting an appeal only from the former.

Fourth, subsection (c)(6) links publication in the Federal Register—which triggers the running of the appeal time period, 17 U.S.C. § 803(d)(1)—to the termination of the time for the Register of Copyrights to review final determinations by the Royalty Judges pursuant to 17 U.S.C. § 802(f)(1)(D). That review by the Register is "for legal error [in] the resolution * * * of a material question of substantive law under this title[.]" 17 U.S.C. § 802(f)(1)(D). The resolution

of *contested* claims to copyright royalty funds could readily implicate interpretation of the Copyright Act. But a finding of no controversy and the straightforward distribution of funds pursuant to a private settlement agreement affords the Royalty Judges no occasion to opine on material questions of law under the Copyright Act.

Indeed, the kinds of legal questions that might arise from a settlement agreement, such as contractual disputes or questions of agency law like IPG raises, are not questions of law "under this title," 17 U.S.C. § 802(f)(1)(D), and would likely fall entirely outside the jurisdiction of the Royalty Judges, *see National Broadcasting Co. v. Copyright Royalty Tribunal*, 848 F.2d 1289, 1295 (D.C. Cir. 1988) (Copyright Royalty Tribunal, predecessor to the Judges, authorized only to decide distributional issues, not "common law claims of entitlement").

There are, in short, two different kinds of decisions that arise in the Copyright Act's royalty distribution process: (1) a determination under Chapter 8 in which the Royalty Judges decide who gets what, subject to direct review in this court; and (2) a mechanical distribution under Chapter 1 in which the parties themselves decide who gets what and the Royalty Judges simply give effect to that uncontroverted division of the pie, with no direct review in this court ensuing. When the parties bypass the controversy process by settling their dispute, they forgo the particular opportunity for judicial review in this court authorized by 17 U.S.C. § 803(d)(1).

## IV

IPG objects that its current management never received notice of the 2003 religious-programming settlements or the ensuing distribution of those funds, and that those agreements were void from the beginning, which now precludes treatment

of this case as a non-controverted settlement. In effect, the company argues, the Royalty Judges decided the merits of whether or not IPG was bound by Oshita's agreements in the guise of determining whether any dispute existed at all.

That is not right. What is key to judicial review is not current IPG management's knowledge of what past management did, but the type of proceeding the Royalty Judges conducted based on the information they were provided by interested parties at the time. And nothing in the record or IPG's argument remotely suggests that the Royalty Judges had any notice of any controversy concerning the settlement agreements or Oshita's authority at the time they made their no-controversy determination. While IPG contends that it gave some *parties* notice of a dispute, IPG does not claim that it gave the Royalty Judges any warning at all. That is particularly troubling given that current IPG management was aware of Oshita's efforts to settle royalty fund disputes by no later than November 3, 2003.[3] The Royalty Judges did not distribute the uncontested religious programming funds until more than two weeks later. Current management thus had time to notify the Royalty Judges that a controversy was brewing. But they did not do so.

Moreover, whatever IPG's grievances with its former president or even with the alleged behavior of other parties, those are questions of corporate authority under state law for state court disposition. They are not the types of issues that fall within the Copyright Act's reach or the Royalty Judges'

---

[3] *See* Opposition of Independent Producers Group to Motion for Final Distribution of 1998 and 1999 Cable Royalty Funds and 1999 Satellite Royalty Funds, Docket No. 2008-1 CRB CD 98-99 (September 5, 2012), J.A. 62.

bailiwick.  *See National Broadcasting Co.*, 848 F.2d at 1295. Indeed, the Royalty Judges delayed proceedings in this case to allow the California courts to determine the disputed questions of corporate authority pertaining to the validity of the 2004 program suppliers settlement agreement.  IPG could have sought a similar stay to litigate Oshita's authority to enter into the 2003 devotional programming agreements.  But it chose not to.

IPG, in short, seeks judicial review under an inapposite jurisdictional grant of a decade-old distribution based on the actions of IPG's then-president, on which the Royalty Judges reasonably relied and, indeed, the authority for which has never been challenged in state court.  We accordingly need not decide what the jurisdictional implications (if any) would be if a diligent and innocent party discovered a fraud for the first time after a distribution occurred, or if the Royalty Judges were on notice of a settlement agreement's challenged validity before they acted.  We also need not consider the availability of extraordinary review for an allegedly *ultra vires* agency action, *see Mittleman v. Postal Regulatory Commission*, No. 12-1095, slip op. at 14 (D.C. Cir. July 8, 2014); *cf., e.g.*, *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670 (1986) (there is a "strong presumption that Congress intends judicial review of administrative action").  Nor need we decide today whether review of the Royalty Judges' determination of no controversy may ever lie in the district court under the Administrative Procedure Act (APA), 5 U.S.C. §§ 501 *et seq. Compare Ethnic Employees of the Library of Congress v. Boorstin*, 751 F.2d 1405, 1416 n.15 (D.C. Cir. 1985) ("the Library [of Congress] is not an agency under the Administrative Procedure Act"), *with Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 684 F.3d 1332, 1341-1342 (D.C. Cir. 2012) (the Royalty Judges

are "a component of the Executive Branch"); *see also* 17 U.S.C. § 701(e) (actions by the Register of Copyrights are subject to APA review).  IPG did not pursue APA review in the district court, and this court may transfer a case to the lower court for initial review only "if it is in the interest of justice[.]"  28 U.S.C. § 1631.  Even assuming such review were available, that interest would be distinctly ill-served by keeping this litigation alive for yet another round.  The appeal is accordingly dismissed for want of jurisdiction.

*So ordered.*