**NATIONAL BROADCASTING COMPANY, INC., Petitioner,**

v.

**COPYRIGHT ROYALTY TRIBUNAL, Respondent,**

**Worldvision Enterprises, Inc., Old Time Gospel Hour, Warner Communications, Inc., et al., Multimedia Entertainment, Inc., Intervenors.**

No. 87–1157.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 1, 1988.

Decided June 7, 1988.

As Amended June 7 and June 21, 1988.

Jerome J. Shestack, Philadelphia, Pa., with whom W. Drew Kastner, New York City, was on the brief, for petitioner.

Jeffrey Clair, Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., and William Kanter, Dept. of Justice, Washington, D.C., were on the brief, for respondent.

Margot Polivy, with whom Katrina Renouf, Washington, D.C., was on the brief, for intervenor Worldvision Enterprises, Inc.

John H. Midlen, Jr., Washington, D.C., was on the brief for intervenor, Old Time Gospel Hour.

Arnold P. Lutzker, Washington, D.C., entered on appearance for intervenor, Multimedia Entertainment, Inc.

Bernard R. Sorkin, New York City, entered an appearance for intervenor, Warner Communications, Inc., et al.

Before MIKVA, RUTH BADER GINSBURG and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Concurring Statement filed by Circuit Judge MIKVA.

SILBERMAN, Circuit Judge:

Under a mechanism created by the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.* (1982 & Supp. IV 1986), cable television companies pay a fee for the privilege of retransmitting conventional broadcast television signals. *See id.* § 111. These cable royalty fees are earmarked as compensation for the owners of the copyrights on the retransmitted programming, and the statute assigns the Copyright Royalty Tribunal ("CRT" or "Tribunal") the task of distributing these royalty fees to the copyright owners. *Id.* §§ 111(d)(4), 801(b)(3). In distributing the fund for calendar year 1984, the CRT faced competing claims by two copyright owners to the sum allocated as royalties for retransmission of "Little House on the Prairie." [1] The National Broadcasting Company ("NBC") asserted its claim as creator and producer of the show, as against Worldvision Enterprises, Inc., which had purchased from NBC the exclusive domestic distribution rights to "Little House" for "conventional free television."

---

1. The CRT's distributions have faced a series of court challenges. *See National Ass'n of Broadcasters v. Copyright Royalty Tribunal,* 675 F.2d 367 (D.C.Cir.1982) ("*NAB I*"); *Christian Broadcasting Network v. Copyright Royalty Tribunal,* 720 F.2d 1295 (D.C.Cir.1983); *National Ass'n of Broadcasters v. Copyright Royalty Tribunal,* 772 F.2d 922 (D.C.Cir.1985) ("*NAB II*"), cert. denied, 475 U.S. 1035, 106 S.Ct. 1245, 89 L.Ed.2d 353 (1986); *National Ass'n of Broadcasters v. Copyright Royalty Tribunal,* 809 F.2d 172 (2d Cir. 1986) ("*NAB III*").

The CRT awarded the royalty fees to Worldvision, relying on its perception that Congress intended the syndicator of non-network programming to be the recipient. NBC petitioned this court for review, pursuant to 17 U.S.C. § 810. It argues Congress actually intended that the *creator* of a program receive the royalty fee, and suggests the CRT both went beyond its competence in construing the contract between NBC and Worldvision and read the contract incorrectly in awarding the royalties to Worldvision. We deny the petition for review and uphold the distribution to Worldvision. In doing so, however, we emphasize that the CRT has no authority to provide a legally significant interpretation of contracts conveying copyrights, and that parties to such contracts have full recourse to normal contractual remedies notwithstanding any distribution by the CRT.

## I.

As our previous cases have described in great detail, *see* cases cited *supra* note 1; *see also Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am.,* 836 F.2d 599 (D.C.Cir.1988), the Copyright Act of 1976 allows cable television operators to retransmit to their subscribers—without negotiating with those who hold programming copyrights—the primary signals of conventional, over-the-air broadcasters. In exchange for the exercise of this right, cable operators must pay a royalty fee to the Register of Copyrights. *See Cablevision,* 836 F.2d at 603–04 (size of fee is based on gross receipts of cable system and number of distant signals it carries). The fund thus created is distributed annually by the Copyright Royalty Tribunal to the copyright owners whose properties were retransmitted. *See* 17 U.S.C. § 111. The pur-

pose of this regulatory structure is to facilitate the exploitation of copyrighted materials by removing the prohibitive transaction costs that would attend direct negotiations between cable operators and copyright holders, while at the same time assuring copyright holders compensation for the use of their property. *See Cablevision,* 836 F.2d at 603.

As a sort of "reverse ratemaking," the CRT's distributions are necessarily inexact, *see National Cable Television Ass'n v. Copyright Royalty Tribunal,* 724 F.2d 176, 182 (D.C.Cir.1983); *NAB I,* 675 F.2d at 374, and reviewing courts have faced a number of complaints from copyright owners claiming the Tribunal should have allocated to them some additional portion of the fund. *See, e.g., NAB II,* 772 F.2d at 940; *NAB III,* 809 F.2d at 174. Although this case appears to be only the latest in this series of challenges to royalty distributions by the CRT, it is unique in that it involves a dispute over who is to receive a particular slice of the pie rather than over the size of the slice.

Section 111(d)(3) directs the Tribunal to distribute the royalty fees to the "copyright *owners* who claim that their works were the subject of secondary transmissions by cable systems." (emphasis added).[2] As presented to the CRT, this case was a legal dispute between NBC and Worldvision over which was the "owner" of the copyright on "Little House on the Prairie" for purposes of the royalty distribution. NBC created and produced "Little House," a series based on children's books by Laura Ingalls Wilder, for broadcast over its network beginning in the 1973–74 season. NBC received a certificate of copyright registration, in its name alone, for each episode. In 1979 and 1982, NBC en-

---

2. The manner of distribution is governed by 17 U.S.C. § 111(d)(4), subsection (B) of which provides:

> After the first day of August of each year, the Copyright Royalty Tribunal shall determine whether there exists a controversy concerning the distribution of royalty fees. If the Tribunal determines that no such controversy exists, it shall, after deducting its reasonable administrative costs under this section, distribute such fees to the copyright owners enti-

tled, or to their designated agents. If the Tribunal finds the existence of a controversy, it shall, pursuant to chapter 8 of this title, conduct a proceeding to determine the distribution of royalty fees.

Section 801(b)(3) of the same title further designates as a purpose of the CRT:

> to distribute royalty fees deposited with the Register of Copyrights under sections 111 and 116, and to determine, in cases where controversy exists, the distribution of such fees.

tered two distribution agreements—which differed materially only respecting which episodes of "Little House" they covered—with Worldvision Enterprises, Inc. These contracts "transfer[red] and grant[ed]" to Worldvision "the full and exclusive domestic distribution and profit participation rights" in "Little House" for a period of thirty-five years. The rights granted Worldvision were to "extend solely to exhibition over conventional free television on other than a national network prime-time basis"; the "Agreement grant[ed] no rights to [Worldvision], and place[d] no restrictions on NBC, regarding any means of distribution or exhibition other than by conventional free, television broadcasts." The contracts mentioned neither cable transmissions nor copyright royalties administered by the CRT. They designated California law as controlling.

NBC based its claim to ownership of the copyright relevant to royalty distribution on its status as creator and producer of "Little House." It argued that it had borne the risks of production and that Congress intended to compensate precisely such creative efforts in passing section 111. Although NBC conceded that a creator can transfer the portion of its copyright that confers a right to cable copyright royalties, it claimed such a transfer must be explicit and unambiguous. NBC contended that the assignments to Worldvision, by omitting all mention of cable royalties and transferring only a right to distribute for conventional free television, left the relevant rights in NBC; the network offered testimony to show it intended to retain its royalty rights when it entered the agreements. Worldvision responded that Congress intended section 111 to favor the syndicator of a program, who was responsible for exploitation of the work, over the producer. It further noted that cable retransmission royalties can arise only if there has been a primary broadcast over conventional television, so that the royalties in question were necessarily linked to Worldvision's distribution rights and activities. Finally, Worldvision argued California law would prohibit consideration of NBC's parol evidence and would require

construction of any ambiguity against the drafter, NBC.

The CRT distributed the royalties to Worldvision, concluding program syndicators "were the ones most directly harmed by the distant signal importation by cable systems ... because they could not orderly control the marketing of their product," 52 Fed.Reg. 8408, 8411 (1987), and further concluding Congress intended to remedy this harm by enacting section 111. The Tribunal identified "the exclusive syndicator of off-network programming, among all those parties in the chain of production and distribution, as the party to whom the Tribunal has in the past and will consistently in the future distribute Section 111 royalties." *Id.* It further justified this ruling both in terms of the predictable functioning of the marketplace, asserting the ruling reflected general industry understanding, and on the basis of an implied contractual analysis (termed "equity"), stating that "Worldvision reimbursed NBC entirely for their interest in off-network syndication." *Id.*

The CRT was careful to point out, however, that its ruling did not "foreclose the syndicator from remitting the cable copyright royalties up or down the chain of production and distribution pursuant to private contractual arrangement." The CRT stated it did not consider itself "the proper forum for the resolution of contract disputes," since its expertise lies in "distribution determinations and ratesetting." *Id.* It left "to private litigation whether the proper construction of the two NBC–Worldvision agreements imposes any obligation on Worldvision to remit royalties to NBC, or whether the actual terms used in the contracts fail to convey to Worldvision the pertinent copyright for cable royalty distribution." *Id.* at 8411–12.

The Tribunal did observe, however, that section 111(d)(3) directed it to distribute royalties to copyright *owners,* and accordingly concluded it had a duty to examine challenges to copyright ownership. It satisfied itself on this point by reference to Worldvision's status as exclusive syndicator, which it said the parties stipulated.

The CRT reasoned that since Worldvision was empowered by the contracts to license television stations to perform "Little House," Worldvision necessarily owned the performance right relevant to the distribution of cable royalties. NBC petitioned this court for review of the CRT's order.

## II.

Both the CRT and the claimants address two quite distinct questions in this appeal, and an understanding of their interrelationship is essential. At issue here are (1) the proper *distributee* of the royalties allocated by the CRT to "Little House"; and (2) the *ownership* of the copyright to which the royalties attach. Thus, the claimants argued to the Tribunal (and all parties argue to us) both principles of contractual construction, which bear on the intent of the parties regarding ownership, and propositions of statutory construction, which purport to show Congress' intent regarding distribution of the royalties. The CRT justified its decision to distribute the royalties to Worldvision primarily in terms of legislative intent. But it surveyed the facts surrounding the agreements just enough to satisfy itself that Worldvision was the "proper party" to receive those royalties, and to establish that "Worldvision reimbursed NBC entirely" for the right involved. 52 Fed.Reg. at 8411.

This distinction between distribution and entitlement lies at the intersection of section 111's compulsory licensing scheme and the rest of copyright and contract law. As the CRT correctly stated, Congress intended that the cable royalties ultimately go to that party who was directly harmed by the retransmission—that is, the owner of the relevant copyright, who would otherwise be uncompensated for the exploitation of his or her property. *See* 52 Fed.Reg. at 8411; *see also Cablevision*, 836 F.2d at 602. But copyrights, or any of their individual constituent parts, are freely alienable. *See* 17 U.S.C. § 201(d). The Copyright Act aids commercial exploitation of copyrights by allowing the sale of particular rights—such as movie rights or rights to perform a popular song—or of the entire bundle. The intent of the parties, as expressed in their contracting, therefore can determine who enjoys copyright protection for certain rights. *See generally* 3 M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT §§ 10.01–.03 (1987). Congress devised section 111 to establish a system of compulsory licensing as a substitute for bargaining between copyright owners and cable companies, since the costs of such bargaining would be prohibitively high, *see Cablevision*, 836 F.2d at 602–03, but it did not intend to disturb contracting between parties who could be owners where the special difficulties of cable retransmission were not involved. In order fully to effectuate the intent of Congress in passing section 111, private orderings of ownership must be honored, so that those actually directly harmed·by retransmissions are those who receive cable royalties. In short, determining that a party owns *a* copyright may be insufficient, for, as here, there may be more than one party able to claim the benefits of a copyright for portions of the property in question. Only reference to the parties' intent can indicate the *relevant* owner. The goals of alienability and divisibility of copyrights would, of course, be subverted if private contracts were not enforced properly.

Thus, although the CRT's methodology of distribution, which bears on issues such as the relative value of various programs, is entitled to the deference we would usually accord administrative agency determinations, *see* cases cited *supra* note 1, for the reasons we explain below we do not believe the CRT was authorized by Congress to make determinations of ownership—as between contending parties—entitled to deference from a court of appeals or any other court.

It appears the CRT at least recognized this problem. The Tribunal stated it did not consider itself "the proper forum for the resolution of contract disputes ... governed as they are by state law," because its "experience and expertise" lay elsewhere. 52 Fed.Reg. at 8411. We have ourselves noted "the CRT functions without benefit of legal assistants," *National Cable Tele-*

*vision Ass'n v. Copyright Royalty Tribunal,* 724 F.2d 176, 182 (D.C.Cir.1983), and the legislative history of the Act shows Congress contemplated that members of the CRT would, with only a clerical staff, "perform all professional responsibilities themselves," and that they would be appointed for their "competence in the field of copyright policy," not contract law. H.R. REP. No. 1476, 94th Cong., 2d Sess., 174–75 (1976), U.S.Code Cong. & Admin. News 1976, 5659, 5790–91. Therefore, just as it would undercut the broad purpose favoring alienability of copyrights found in the Copyright Act to determine ownership conclusively by a general rule favoring syndicators, so too it would be improper to determine the rights of NBC and Worldvision on the basis of the actions of the Tribunal, which admittedly "chose[ ] not to delve ... into the contractual arrangements." 52 Fed.Reg. at 8411. We think the Tribunal was correct in leaving to private litigation the proper construction of the agreements. *Id.* at 8411–12.

The CRT's order is ambiguous on this point, however, for it perceived itself to be caught in a quandary—although we think it was not. Despite its conviction that it could not interpret contracts, it understood a portion of our opinion in *NAB II* to require it to determine ownership. In *NAB II*, one claimant before the CRT suggested that another had received payment for programs that were in the public domain, not owned by the challenged claimant, or for that matter anyone else. After upholding the CRT's distribution, we admonished it, out of concern over "potential difficulties ... in future proceedings," to "establish ... a sensible way in which a good-faith examination of and challenge to copyright ownership can be effected." 772 F.2d at 937. In response to the competing contentions of NBC and Worldvision regarding the effect of the agreements, the CRT sought to slip between the horns of this dilemma—to resolve an ownership challenge without construing a contract. It attempted to determine entitlement by, in effect, peeking at the contracts, but not analyzing them fully, and by drawing an artificial distinction between copyright

ownership and the right to the cable royalties, one of the incidents of ownership. The CRT purported to satisfy itself of Worldvision's ownership by relying on a stipulation that Worldvision was the exclusive syndicator to broadcast television stations of "Little House." It reasoned from that premise that, since it is such broadcasts that are retransmitted and that give rise to cable royalties, Worldvision was the proper party to claim those royalties. The Tribunal hedged, though, by stating worldvision was "free to promise royalties to the producer of the program ... as the parties to the contract see fit." 52 Fed.Reg. at 8411. This reasoning, especially since it arose from an inquiry into ownership, could be characterized as a conclusion that Worldvision *owns* the copyright and the related right to royalties. The Tribunal's earlier statement that Worldvision had fully reimbursed NBC for the syndication right and therefore bore all harm from cable retransmissions, *id.,* could similarly be seen as a finding on the intent of the parties in entering the agreements.

We do not think the order can be enforced if interpreted this broadly. Our advice in *NAB II* that the CRT augment its procedures for resolving challenges to ownership was not part of the holding of that case, for we explicitly noted there was no challenge to the regulation at issue. 772 F.2d at 937. The dispute in *NAB II* was also markedly different from the one here. It involved *whether* certain programs were covered by copyright at all or had passed into the public domain, not the contractual question of *who owns* an existing copyright. Even if the CRT is obliged to answer the former question, *NAB II* does not require the CRT to settle contractual disputes related to cable royalty distributions. Nor can the CRT determine such contractual disputes "half-way," drawing a line between copyright ownership and right to the royalties, resolving the former without reference to the contracts but leaving the latter to private negotiation. As we have explained, ownership is itself dependent on the contractual terms; it cannot be settled without reference to those terms. In its

opinion, though, the CRT made no reference to contractual terms or the intent of the parties in determining that distribution to Worldvision was proper. As counsel for the CRT put it at oral argument, "rather than construe the language of the contract directly, [the Tribunal] drew an inference based on its understanding of how this market operates." [3] Similarly, the CRT apparently relied on no record evidence in stating that Worldvision and NBC had allocated the risks of cable retransmisison in a particular manner, and the risk could easily have been shifted to either party.

If the CRT's order were understood as resolving the contractual dispute, it is, moreover, internally contradictory. The Tribunal's clear understanding that parties can order rights *inter se* as they please by contract would be in tension with its disposition of those rights with only passing reference to that contract. And its referral to private litigation of contractual matters —including "whether the actual terms used in the contracts fail to convey to Worldvision the pertinent copyright for cable royalty distribution," 52 Fed.Reg. at 8412— would make little sense if the Tribunal had formally determined that the contracts "convey[ed] to Worldvision the pertinent copyright." *Id.*

Indeed, if the CRT did purport to determine ownership rather than distribution, a constitutional problem might thereby be raised. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986); *see also Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 584, 105 S.Ct. 3325, 3334–35, 87 L.Ed.2d 409 (1985) ("Congress may not vest in a non-Article III court the power to adjudicate, render final judgment and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review."). To be sure, the federal courts, by operation of 28 U.S.C. § 1338(a), have exclusive jurisdiction over actions "arising under" the Copyright Act, such as infringement actions. Even in federal courts, however, state law principles govern construction of contracts, and other copyright-related matters, such as determination of ownership by transfer (outside an infringement action), are generally for the state courts. *See T.B. Harms Co. v. Eliscu*, 339 F.2d 823, 828 (2d Cir.1964), *cert. denied*, 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965); *see also Vestron, Inc. v. Home Box Office, Inc.*, 6 U.S.P.Q.2d (BNA) 1016 (9th Cir.1988).[4] *See generally* 3 M. NIMMER & D. NIMMER, *supra*, § 12.01[A]. It is thus unclear whether copyright ownership claims, resting as they do on a mix of state and federal law, would present the constitutional difficulties the Court wrestled with in *Schor*. At minimum, however, this question suggests that if Congress wished the CRT to adjudicate entitlement claims— which the agency does not explicitly assert —it would have manifested its intent clearly, as the Supreme Court held Congress did in *Schor*, 106 S.Ct. at 3253.[5] The statute does direct distribution to the "copyright owners entitled," but we do not think congressional intention to direct a federal agency to adjudicate common law claims of entitlement can rest on those words alone. We take that language to be designed only to guide the CRT's distribution obligations. Indeed, the CRT does not claim the stat-

---

**3.** If we did believe the CRT's ruling bound these parties, then, we would almost certainly grant the petition for review on the strength of the CRT's failure to adduce substantial evidence for its position. As we have discussed, such a disregard for private orderings would be inimical to the scheme of the Copyright Act.

**4.** Under the current Act, failure to pay "statutory royalties," such as those for the privilege of cable retransmissions, are made acts of infringement under 17 U.S.C. § 501, and belong in federal court for that reason. *See* 17 U.S.C. § 111(c)(2).

**5.** Here, unlike in *Schor*, if the CRT were authorized to determine ownership, it could not be said that the parties voluntarily chose to bring their claims to that agency. The CRT has the money and the authority to distribute it. There is no alternative forum for distribution of cable royalties. However, parties aware of their dispute sufficiently far in advance of the CRT's distribution proceeding—the timing of which is partly governed by statute, *see* 17 U.S.C. § 111(d)(4)—might be able to get a judgment that the CRT would recognize.

ute's wording authorizes a CRT entitlement determination in the face of conflicting claims; and as we have noted, no viable distinction can be drawn between copyright ownership and rights to royalties. We therefore conclude the CRT's ruling should not be seen at all as adjudicating the contractual entitlement rights of NBC and Worldvision, but rather as setting forth a general rule for the distribution of cable royalties in these cases. This disposition leaves the parties free to litigate their contractual claims in an appropriate forum.[6]

### III.

Given this understanding of the scope of the Tribunal's order, the propriety of its interpretation of the Act in deciding to distribute cable royalties to the "exclusive syndicator of off-network programming" is rather easily resolved. The Act is silent on this matter, prescribing only that copyright owners are to receive cable royalties, 17 U.S.C. § 111(d)(4)(B); nor have we found any dispositive statement of congressional intent. The House Report does refer specifically to creators at one point: "In general, the Committee believes that cable systems are commercial enterprises whose basic retransmission operations are based on the carriage of copyrighted program material and that copyright royalties should be paid by cable operators to the *creators* of such programs." H.R.REP. No. 94–1476 at 89, U.S.Code Cong. & Admin. News 1976, p. 5704 (emphasis added). Four paragraphs later, however, the Report states that the Act's concern is the copyright owner: "[T]he retransmission of distant non-network programming by cable systems causes damage to the copyright owner by distributing the program in an area beyond which it has been licensed. Such retransmission adversely affects the ability of the copyright owner to exploit the work in the distant market." *Id.* at 90, U.S.Code Cong. & Admin.News 1976, p.

5704. We agree with the Tribunal that use of the word "creator" was not a congressional expression of a preference for one owner over another. 52 Fed.Reg. at 8411. The Tribunal's view—that Congress' general concern was for the owner whose interests are directly thwarted by cable retransmission, that is the owner who bears the direct risk of exercise of the compulsory license—seems to us consonant with Congress' intent in creating the compulsory licensing system. But it does not appear Congress ever considered the particular impact of the divisibility of copyright on section 111's compulsory licensing scheme, so this is an area where we look first to the agency's expertise to fill the gap. The CRT determined that the directly affected party will *typically* be the exclusive syndicator, and that the CRT will therefore as a general rule always distribute royalties initially to the syndicator. This presumption by the CRT, in the face of congressional silence, is a permissible interpretation of the statute, to which we defer. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

Private litigation will still be the ultimate determinant of parties' property and contractual rights. Now that the distribution rule is in place, parties can order their affairs to minimize even that litigation cost. We made a related observation in *NAB I:*

> The allocation of the 1978 Fund will not displace the operation of relevant market forces in the future. Now that that Tribunal's methods are known, for example, broadcasters will bargain more knowledgeably with sports teams about telecasts of sports events, and representatives of music, programs, and movies may contract accordingly with television broadcasters. In any event, as the size of the Fund grows, the dispute over how to slice the pie may be more vigorous but it will also be more structured. The um-

---

**6.** In this light, the CRT's limited examination of the contract may be seen as a device to reduce administrative costs. If a quick look at the contract between contestants for particular cable royalties would reveal that the general rule of distribution would be contrary to the parties' intent and would almost certainly be upset in later private litigation, the CRT might reduce subsequent litigation costs by creating a limited exception to its rule. Of course, such a decision by the CRT would still have no significant legal effect.

pire has established precedents on which the players may rely in submitting their claims.

675 F.2d at 385; *see also* Coase, *The Problem of Social Cost*, 3 J.L. & ECON. 1 (1960). The Tribunal's distribution rule will serve Congress' ends by ensuring initial distribution to the parties who are likely to bear the risks of the compulsory license while preserving the full contractual rights of all parties. The petition for review is therefore

*Denied.*

MIKVA, Circuit Judge, concurring:

I concur in the disposition and excellent opinion of my colleague save for its unnecessary discussion of a gossamer constitutional problem that is not present in the case, is not decided by the opinion, and would appear only if the Copyright Royalty Tribunal (CRT) decided a different case under a different statute with a different result. Such speculations on hypothetical dilemmas do not shed any light for anyone, and run afoul of the jurisprudential rule of avoiding unnecessary resolution of constitutional issues. *See, e.g., Blum v. Bacon*, 457 U.S. 132, 137, 102 S.Ct. 2355, 2359, 72 L.Ed.2d 728 (1982).

I refer to the discussion of the hypothetical constitutional problem, *supra*, 1295–96 of the opinion—a dilemma that would have arisen if the CRT had sought to determine ownership rather than distribution rights. Judge Silberman acknowledges that the CRT did no such thing; that ought to pretermit any need to discuss the complications of whether this statute would allow such a determination and whether such a determination would run afoul of constitutional limitations. Constitutional questions especially ought not be given such obiter dicta flybys.